**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:25-cv-61620-EA**

Florida State Lodge Fraternal Order of Police, Inc.,
*a Florida not for profit corporation*,
Joel Cuarezma, *individually*, and
Scott Kushi, *individually*,

      Plaintiffs,

v.

City of Pembroke Pines, Florida,
*a Florida municipality*,
Jose J. Vargas, *in his official capacity*,

      Defendants.

_____/

**ORDER DENYING PLAINTIFFS' MOTIONS FOR TEMPORARY**
**RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS**

This cause is before the Court on the plaintiffs' motions for temporary restraining orders and preliminary injunctions [ECF Nos. 7 & 19]. Having held a hearing on September 25, 2025, in which the parties were given an opportunity to present evidence but chose to instead rely on the supplied affidavits, and having considered the parties' arguments, the Court denies both motions because (1) the plaintiffs have not proven irreparable harm; (2) based on the evidence from the supplied affidavits, the alleged public records request is invalid and unenforceable under Florida law; and (3) other than the alleged public records request, there has not been any other action that could constitute a search under the Fourth Amendment.

**Background**

Sergeant Cuarezma and Detective Kushi both work for the City of Pembroke Pines ("the City") as law enforcement officers in the Pembroke Pines Police Department ("the Police

Department"). ECF No. 1-1 ¶ 3; ECF No. 7-1 ¶ 2. Additionally, Sergeant Caurezma is an active member in the Fraternal Order of Police Union ("the Union"), and Detective Kushi is the president of the Union. ECF No. 1-1 ¶ 3; ECF No. 7-1 ¶ 2.

In June 2025, the Police Department faced a staffing shortage on the bicycle patrol team Sergeant Cuarezma was assigned to. ECF No. 1-1 ¶ 9. Because of this staffing shortage, the unit captain, Captain Feiner, ordered Sergeant Cuarezma to seek volunteers to change work shifts. ECF No. 1-1 ¶ 9. Pursuant to this order, Sergeant Cuarezma sent out an email seeking volunteers to swap shifts ("the volunteer email"). ECF No. 1-1 ¶ 10.

After the volunteer email was sent out, Detective Kushi sent a text message to Sergeant Cuarezma explaining that he believed the volunteer email violated the terms of the collective bargaining agreement ("the CBA"). ECF No. 1-1 ¶ 11. Over the course of two days, they sent a series of text messages to each other and had a phone conversation, discussing the terms of the CBA and how the terms related to the volunteer email. ECF No. 1-1 ¶ 11-12. The text message conversations took place strictly on personal cell phones—which the City does not reimburse them for—while the two men were off duty. ECF No. 1-1 ¶ 13-14.

After these conversations, Sergeant Cuarezma told Captain Feiner that he believed the volunteer email violated the CBA and that he was going to recall the volunteer email to avoid a violation of the CBA. ECF No. 1-1 ¶ 15. But Captain Feiner told Sergeant Cuarezma not to recall it and that Captain Feiner would handle the matter himself. ECF No. 1-1 ¶ 15. Nevertheless, Sergeant Cuarezma sent out a second email instructing the volunteer email's recipients to "disregard" the volunteer email. ECF No. 1-1 ¶ 15.

Captain Feiner then, through his Police Department email, requested that Sergeant Cuarezma provide him with copies of the text messages between Sergeant Cuarezma and Detective Kushi

2

discussing the CBA since Captain Feiner disagreed with their interpretation of the CBA. ECF No. 1-1 ¶ 16. Sergeant Cuarezma, however, declined to do so. ECF No. 1-1 ¶ 16. Captain Feiner then acknowledged receipt of Sergeant Cuarezma's answer and thanked him for the reply. ECF No. 1-2.

Thereafter, Sergeant Sorensen of the Police Department's Internal Affairs Department ("Internal Affairs") notified both Sergeant Cuarezma and Detective Kushi that they both were the subject of an internal investigation regarding their text message conversations and that they needed to "preserve any correspondence" between each other related to the volunteer email. ECF No. 1-1¶ 17; ECF No. 1-4 at 1; ECF No. 7-1 ¶ 10. At least as to Detective Kushi, this internal investigation was for alleged insubordination for failing to take his concerns about the volunteer email through the proper chain of command. *See* ECF No. 25-1 ¶

Then about a month later, Sergeant Sorensen told Sergeant Cuarezma that although he was merely a witness in the investigation, he was still ordered to preserve the communications between himself and Detective Kushi. ECF No. 1-1 ¶ 18. Thereafter, Sergeant Sorensen sent Sergeant Cuarezma an email demanding that Sergeant Cuarezma surrender his text messages with Detective Kushi pursuant to Florida's public records law. ECF No. 1-1 ¶ 19. In response, Sergeant Trabue, a Union Executive Board Member, sent Sergeant Sorensen an email, on behalf of Sergeant Cuarezma and the Union, asking to see the public records request to evaluate it since the Union believed that the text messages were not public records. ECF No. 1-1 ¶ 20.

After receiving Sergeant Trabue's email, Sergeant Sorensen submitted what he referred to as a public records request on behalf of the police department requesting "[a]ny and all documents to include emails, texts, notes[,] or anything else in writing related to the Bicycle Patrol School request for volunteers that occurred between Captain A. Feiner, Detective S. Kushi, and Sergeant

3

J. Cuarezma[.]" *See* ECF No. 25-1 ¶ 9-11; ECF No. 25-2; hearing transcript at 18 (City's counsel stating that "[t]he actual public records request [was] made by Sergeant Sorensen").

Sergeant Sorensen then sent the alleged public records request to Sergeant Trabue and threatened that "the failure of Sergeant Cuarezma[] to produce these documents will be directly contrary to an official order and subject to the penalties listed in Section 119.10, Florida Statutes[,]" which provides that "[a]ny person who willfully and knowingly violates[] . . . [a]ny of the provisions of this chapter commits a misdemeanor of the first degree[.]" *See* ECF No. 1-1 ¶ 21; § 119.10(2)(a), Fla. Stat. Sergeant Cuarezma was ordered to comply by August 6, 2025. ECF No. 1-1 ¶ 24.

Later, Sergeant Sorensen told Detective Kushi that he also needed to comply with the alleged public records request and give the text messages to Internal Affairs. ECF No. 18-1 ¶ 11. Detective Kushi was ordered to comply by August 26, 2025. ECF No. 18-1 ¶ 11.

Neither Sergeant Cuarezma nor Detective Kushi complied with the alleged public records request by their respective deadlines. ECF No. 25-1 ¶ 13, 18. Additionally, after Detective Kushi's deadline passed, he received a notice that he was under an additional internal investigation for insubordination resulting from his failure to comply with the alleged public records request. ECF No. 25-1 ¶ 19.

These events led to Sergeant Cuarezma and Detective Kushi filing these motions for temporary restraining orders and/or preliminary injunctions. *See generally* ECF No. 7, 19.

**Analysis**

To obtain a preliminary injunction, a plaintiff must prove four elements: "(1) a substantial likelihood that [the] plaintiff will prevail on the merits, (2) a showing that [the] plaintiff will suffer irreparable injury if an injunction does not issue, (3) proof that the threatened injury to

[the] plaintiff outweighs any harm that might result to the defendants, and (4) a showing that the public interest will not be disserved by grant of a preliminary injunction." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284-85 (11th Cir. 1990).

### *The Alleged Public Records Request and Irreparable Harm*

The plaintiffs argue that they have proven irreparable harm because they have proven a violation of constitutional rights, which constitutes per se irreparable harm, and this alleged violation of constitutional rights would cause them to forever lose the private nature of their cell phone communications. *See* ECF No. 7 at 15-16; ECF No. 19 at 16-17.

But a violation of constitutional rights does not constitute per se irreparable harm. And the plaintiffs have not proven they are at risk of any irreparable harm because the means through which the City ordered them to turn over their text messages—Sergeant Sorensen's alleged public records request—is invalid and unenforceable under Florida law.

### Constitutional Violations and Per Se Irreparable Harm

A federal court's equitable jurisdiction is limited to the equitable authority Congress has granted to it. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) ("A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power."). Through the Judiciary Act of 1789, Congress codified the equitable jurisdiction of the English High Court of Chancery in its initial grant of equitable jurisdiction to federal courts. *See id.* Thus, the extent of a federal court's equitable jurisdiction is the same as the extent of the English High Court of Chancery's equitable jurisdiction at common law. *Id.*; *see also Payne v. Hook*, 74 U.S. 425, 430 (1869) ("The equity jurisdiction conferred on the Federal courts is the same that the High Court of Chancery in England possesse[d].").

At common law, the English High Court of Chancery could issue preliminary injunctions. 3

William Blackstone, *Commentaries* *443. But the High Court of Chancery decided only "private law matters . . . almost exclusively in the context of resolving property disputes" and could not "supervise . . . administrative activity." James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of Ex Parte Young*, 72 Stan. L. Rev. 1269, 1294 (2020).

As such, the Judiciary Act of 1789 did not confer on federal courts the authority to enjoin the States for constitutional violations. Congress, however, later modified this through 42 U.S.C. § 1983.

42 U.S.C. § 1983 states that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity*, or other proper proceeding for redress[.]" (Emphasis added).

Thus, the plain text of § 1983 clearly authorizes federal courts to enjoin the States for violations of federal law—including constitutional violations. But nothing in § 1983's plain text changes the standard required to obtain equitable relief.

To prove entitlement to a preliminary injunction against a State for a constitutional violation, the movant must prove that the harm is sufficiently analogous to the type of harm the High Court of Chancery would issue a preliminary injunction to prevent. *See Trump*, 606 U.S. at 842 (considering whether there was a historical analog among the relief that the English High Court of Chancery could issue and concluding that the Judiciary Act of 1789 did not authorize the issuance of universal injunctions).

Historically, the High Court of Chancery would not issue preliminary injunctions to remedy

6

ordinary trespasses but instead required a showing of "waste[] or other injuries of an equally urgent nature[.]" *See* 3 William Blackstone, *Commentaries* * 443 (citation modified). In other words, the High Court of Chancery required a showing that the injury was permanent in nature because "waste" was the "spoil or destruction in houses, gardens, tress, or other corporeal hereditaments, to the disherison of him that has the remainder or reversion in fee simple or fee-tail." *See* 2 William Blackstone, *Commentaries* *281 (citation modified). Ordinary trespasses did not satisfy this standard because they were broader than "waste" and included "any transgression or offense against the law of nature, of society, or of the country in which we live[.]" *See* 3 William Blackstone, *Commentaries* *208 (citation modified).

Accordingly, the High Court of Chancery would have required the movant to prove that the alleged constitutional violation caused a permanent injury like "waste" before issuing a preliminary injunction.

Indeed, the Supreme Court has already concluded this.[1] *See Fenner v. Boykin*, 271 U.S. 240, 243 (1926) ("*Ex Parte Young*, 209 U.S. 123 [(1908)], . . . established the doctrine that when absolutely necessary for protection of constitutional rights courts of the United States have power to enjoin state officers from instituting criminal actions. *But this may not be done except under extraordinary circumstances where the danger of irreparable loss is both great and immediate*." (emphasis added)); *see also* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 Harv. J. L. & Pub. Pol'y 743, 754 (2012) ("Under the Supreme Court's equitable jurisprudence, where the plaintiff's claim is grounded in the Constitution, as opposed to a federal statute or common law, [the plaintiff] is not

---

[1] The Supreme Court has recognized that First Amendment violations could constitute per se irreparable harm. *See, e.g.*, *Elrond v. Burns*, 427 U.S. 347, 373 (1976). However, there is no First Amendment violation here.

relieved from having to demonstrate irreparable injury.").

Additionally, the Eleventh Circuit has followed this principle by holding a violation of the Fourteenth Amendment to not be per se irreparable harm. *See Cunningham v. Adams*, 808 F.2d 815, 821-22 (11th Cir. 1987) (rejecting the appellant's argument that a violation of the Fourteenth Amendment's Due Process Clause is per se irreparable harm).

Thus, even when the movant alleges a constitutional injury, the movant must still prove irreparable harm.[2] But Sergeant Cuarezma and Detective Kushi have not done so here because, as will be discussed below, the alleged public records request is invalid and unenforceable under Florida law and the only harm arising from the insubordination investigation is the money and time spent to defend. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors*, 896 F.2d at 1285 ("The key word is *irreparable*. Mere injuries, however substantial, in terms of *money*, *time*[,] and energy expended in the absence of a stay[] are not enough." (emphasis modified) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))).

The Invalidity of the Alleged Public Records Request

The Florida Constitution grants "[e]very *person* . . . the right to inspect or copy any public record[.]" Art. I, § 24(a), Fla. Const. (emphasis added). Consistent with this, the Florida Legislature has made it "the policy of this state that all state, county, and municipal records are open for personal inspection and copying *by any person*." § 119.01(1), Fla. Stat. (emphasis added). The Florida Legislature has also made it the "duty of each *agency*" to "[p]rovid[e] access to public records[.]" *Id.* (emphasis added).

---

[2] In reaching this conclusion, this Court acknowledges that one court in this District has concluded that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Gayle v. Mead*, 614 F. Supp. 3d 1175, 1205 (S.D. Fla. 2020) (quoting *Elrond v. Burns*, 427 U.S. 347, 373 (1976)). But *Elrond*, which *Gayle* relies on, applies only to the First Amendment. *See Elrond*, 427 U.S. at 373 ("The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (emphasis added)). Thus, this Court declines to follow *Gayle*.

Florida law requires these provisions to be applied consistent with their plain and ordinary meanings, as determined with the aid of the canons of statutory interpretation. *See Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) ("Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules, the traditional canons of statutory interpretation can aid the interpretive process from beginning to end.").

Florida law does not define the word "person" as used in either Article I, section 24(a), of the Florida Constitution or section 119.01(1), Florida Statutes. But there is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 781 (2000). Indeed, "the word *person* traditionally *excludes* the sovereign." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 219 (2012) (emphasis modified). And exclusion "of the sovereign means [exclusion] of agencies of the sovereign as well." *Id.* Thus, as used in Article I, section 24(a), of the Florida Constitution and section 119.01(1), the word "person" refers to a common law person[3] and not the government or its agents. *See id.* at 251 ("The age-old principle is that words undefined in a statute are to be interpreted and applied according to their common-law meanings.").

Indeed, this is supported by the fact that section 119.01(1) *distinguishes* a "person" from an "agency." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; *a material variation in terms suggests a variation in meaning*." (emphasis added)). For purposes of section 119.01, while Florida law does not define "person," it does specifically define "agency"

---

[3] A common law person includes corporations and other business entities. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 219 (2012); *see also Promenade D'lberville, LLC v. Sundy*, 145 So. 3d 980, 982 (Fla. 1st DCA 2014) (concluding that Florida's public records law was violated when there was an unjustifiable delay in providing non-exempt public records requested by an LLC).

to "mean[] any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law[,] . . . and any other public or private agency, person, partnership, corporation, or business entity *acting on behalf of any public agency.*" *See* § 119.011(2), Fla. Stat. (emphasis added). Thus, if an entity satisfies section 119.011(2)'s definition of an "agency," the entity cannot also be a "person" under section 119.01(1).

At the hearing this Court held, the defendants argued against this interpretation because "agencies make public records requests all the time" and in any event, "the request [here] was made [by] an individual, Sergeant Sorensen." Hearing transcript at 18. Florida law enforcement is even instructed that public employees are "persons" who can make public records requests under Florida law. *See Public Records A Guide for Law Enforcement Agencies*, Office of the Attorney General of the State of Florida at 55 (2025) (citing Op. Att'y Gen. Fla. 75-175 (1975) (hereinafter "AGO 75-175")).

However, AGO 75-175 does not address whether a public employee *acting on behalf of an agency* can make a public records request. Instead, it states only that a public employee can make a public records request when acting in a private or personal capacity because it concludes that a public employee can make a public records request without obtaining a "supervisor's approval or authorization." *See* AGO 75-175. In other words, it states a general principle that a public employee does not forfeit his rights as a private citizen when he becomes a public employee and does not address a situation where the public employee makes a public records request on behalf of an "agency." *See id.*

As such, consistent with the plain meaning of Chapter 119, Florida Statutes, when a public employee makes a public records request while acting on behalf of an agency, the public

10

employee ceases to be a "person" within the meaning of the statute and instead becomes an "agency." Indeed, it would be non-sensical for a public employee acting on behalf of his "agency" employer to be authorized to make a public records request because, in this scenario, the "agency" would be making the request from itself, which would mean the agency already has access to the records.

As Sergeant Sorensen detailed in his affidavit, one of his duties in Internal Affairs was to investigate Sergeant Cuarezma and Detective Kushi in this matter. *See* ECF No. 25-1 ¶ 2, 4-23. Thus, he was "acting on behalf of" the Police Department—and by extension the City—when he made the alleged public records request for the text messages at issue here. *See Behalf*, Black's Law Dictionary (12th ed. 2024) ("*On behalf of* means 'in the name of, on the part of, [or] as the agent or representative of.'").

This is especially true because Sergeant Sorensen threatened that "the failure of Sergeant Cuarezma[] to produce these documents will be directly contrary to an official order[.]" ECF No. 18 ¶ 23. Thus, he was making the alleged public records request on behalf of the Police Department—and by extension the City—which is why he threatened that the failure "to produce these documents will be directly contrary to an official order[.]" Obviously, the failure to comply with the alleged public records request could not be "directly contrary to an official order" if Sergeant Sorensen was simply making it as a public employee on behalf of himself because he has no authority to issue an official order except by and on behalf of the Police Department—and by extension the City.

Moreover, Sergeant Sorensen did not make the alleged public records request until *after* Sergeant Trabue, on behalf of Sergeant Cuarezma and the Union, asked to see the alleged public records request *Sergeant Sorensen* referenced in his initial demand for Sergeant Cuarezma to

surrender the text messages. *See* ECF No. 25-1 ¶ 9-11. In other words, Sergeant Sorensen did not generate the alleged public records request until after Sergeant Cuarezma and the Union contested the initial demand, thereby further evidencing that he made the alleged public records request on behalf of the Police Department and the City.

Because the evidence shows that Sergeant Sorensen made the request "on behalf of" the Police Department and the City, he made the request as an "agency" and not as a "person." Accordingly, the request is invalid and unenforceable because section 119.01(1) allows only a "person," not an "agency," to make a public records request. And because the alleged public records request is invalid and unenforceable, Sergeant Cuarezma and Detective Kushi cannot lawfully face any criminal penalties for not complying with it. *See* § 119.10(2)(a), Fla. Stat. (requiring a "willful[] and knowing[] violat[ion]" of "[a]ny of the provisions of this chapter" for a person to be guilty of a first-degree misdemeanor).

Therefore, Sergeant Cuarezma and Detective Kushi have not established that they have or are likely to suffer any irreparable harm from not complying with what appears from the evidence to be an invalid and unenforceable request.

### The Fourth Amendment

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

A government action is a search if such action would have been considered a search at common law. *See Mattox v. United States*, 156 U.S. 237, 243 (1895) ("We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted[.]"); *see also Kyllo v. United State*, 533 U.S. 27, 34 (2001) (explaining that the Fourth Amendment has "roots deep in the common law").

12

At common law, a governmental search of documents occurred if there was an "intrusion of executive agents into . . . the private papers of individuals[.]" Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 299 (2d ed. 1871); *see also Boyd v. United States*, 116 U.S. 616, 627 (1886) (explaining that English law required there to be an "invasion of private property" for such action to be considered an unlawful search or seizure). In other words, a common law search occurred if the government "entered [the papers] without permission." *See Intrusion*, Black's Law Dictionary (12th ed. 2024).

Here, however, the evidence does not establish that the police department has a valid and enforceable request requiring a search of the text messages, and the Police Department's other relevant actions—i.e., (1) Captain Feiner's request to Sergeant Cuarezma to send Captain Feiner the text messages and (2) the orders for Sergeant Cuarezma and Detective Kushi to "preserve any correspondence" between each other related to the volunteer email—do not constitute searches under the Fourth Amendment.

As to Captain Feiner's request, this was not an "intrusion" because he did not threaten Sergeant Cuarezma with penalties for not complying with his request or otherwise force Sergeant Cuarezma to surrender the text messages. *See* ECF No. 1-1 ¶ 16; ECF No. 1-2. In other words, this was simply a request for Sergeant Cuarezma's consent to search the text messages so that the Police Department could conduct a lawful search. *See Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.").

And as to the "preserve any correspondence" orders, these did not order Sergeant Cuarezma and Detective Kushi to surrender the text messages or otherwise allow the Police Department to

view the messages. *See* ECF No. 1-1¶ 17; ECF No. 1-4 at 1; ECF No. 7-1 ¶ 10. Instead, they were merely orders to "preserve" the text messages. *See* ECF No. 1-1¶ 17; ECF No. 1-4 at 1; ECF No. 7-1 ¶ 10.

**Conclusion**

Therefore, it is **ORDERED AND ADJUDGED** that the plaintiffs' motions for temporary restraining orders and/or preliminary injunctions [ECF Nos. 7 & 19] are **DENIED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of March 2026.

ED ARTAU
UNITED STATES DISTRICT JUDGE

Copies Served:

**Paul A. Daragjati**
Paul Daragjati, PLC
4745 Sutton Park Court
Ste 503
Jacksonville, FL 32224
904-379-4117
Email: paul@daragjatilaw.com

**Rose Daragjati Szikszay**
Paul Daragjati, PLC
4745 Sutton Park Court
Suite 503
Jacksonville, FL 32224
904-379-4117
Email: rose@daragjatilaw.com

**Stephen J. Powell**
4745 Sutton Park Ct.
Ste 503

Jacksonville, FL 32224
904-379-4117
Fax: 904-379-7108
Email: steve@daragjatilaw.com

**Christopher J. Stearns, Jr.**
Johnson Anselmo Murdoch Burke Piper & Hochman PA
2455 E Sunrise Boulevard
Suite 1000
Fort Lauderdale, FL 33304
954-463-0100
Fax: 954-463-2444
Email: stearns@jambg.com

**Jonathan Howard Railey**
JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER & HOCHMAN, PA
2455 E. Sunrise Boulevard, Suite 1000
Fort Lauderdale, FL 33304
(954) 463-0100
Fax: (954) 463-2444
Email: railey@jambg.com